## SCHLESINGER et al. v. KENNERLY et al.
### No. 2098.

Court of Civil Appeals of Texas. Beaumont.
July 3, 1931.

Rehearing Denied Sept. 2, 1931.

Robert L. Sonfield, of Houston, for plaintiffs in error.

Williams, Lee, Hill, Sears & Kennerly, of Houston, for defendant in error Kennerly.

King, Wood & Morrow, of Houston, for defendants in error Marine Bank & Trust Co. and Fidelity & Deposit Co. of Maryland.

WALKER, J.

This is an appeal by writ of error, but the parties will be referred to as appellants and appellees. The appeal was taken to the Galveston Court of Civil Appeals, but transferred by the Supreme Court to the docket of this court. Appellee Ples B. Kennerly instituted this suit on·March 5, 1928, against H. B. Schlesinger, J. H. Rafferty, E. J. Jarrard, J. R. Plumb, and the partnership of Jarrard & Plumb, and many other defendants, on the theory that the defendants were partners doing business under the partnership name of University Ice Cream Company, and that he was employed by the partnership as general manager. His suit was for unpaid salary in the sum of $1,198.66, for money advanced by him to the partnership $814.62, and for judgment that the partnership be adjudged primarily liable and he secondarily liable upon a certain note for $1,000 executed by him for the partnership, and a bank overdraft of $21.-99 made by him in managing the business of the partnership, the note and the overdraft being fully described in the petition, and further for title and possession of a certain dwelling house built by him upon the property

of the alleged partnership. After appellee filed his suit, Marine Bank & Trust Company instituted a suit upon the $1,000 note and overdraft, against University Ice Cream Company, as a corporation, and appellee Ples B. Kennerly. On the 16th day of November, 1928, these suits were consolidated. Afterwards Fidelity & Deposit Company of Maryland was made a party to the suit on allegations that it owned the note. By proper pleas filed by appellants, all allegations of the plaintiffs' pleadings were put in issue. Upon trial to a jury a peremptory instruction was given in favor of all the defendants except Schlesinger, Rafferty, Jarrard, and Plumb, and no complaint is before us against that instruction. As to the four defendants named, the jury found that they were partners, doing business under the firm name of University Ice Cream Company, and that one D. W. (Denton) Cooley had general authority to act for the partnership in handling and managing its business. It was further found that Cooley, within the scope of his authority, employed appellee as manager of University Ice Cream Company at a salary of $200 per month, and that this contract was directly authorized by appellants Schlesinger and Rafferty; that the partnership was due appellee $1,183.50 on his salary account; that Cooley, within the scope of his authority, received for the partnership, from appellee Ples B. Kennerly, and receipted therefor, the sum of $700, and that this act was directly authorized by appellants Schlesinger and Rafferty; that no part of the $700 was repaid to appellee Kennerly. It was further found that appellee Kennerly advanced to the partnership the sum of $114.62, no part of which was repaid to him. The $700 was paid by Kennerly to Cooley, as agent for the partnership, as earnest money on a proposed sale of the property and business of University Ice Cream Company to appellee Kennerly. The jury found that this sale was not consummated. On the pleadings and evidence judgment was entered in favor of appellee Kennerly against all parties adversely interested for the title and possession of the house sued for, with the right to remove it from the premises of University Ice Cream Company, except as against the administrator of the estate of Cooley, Cooley being sued as one of the defendants, but having died after the institution of the suit, an administration having been sued out upon his estate. Judgment was also entered in favor of appellee Kennerly against University Ice Cream Company and appellants Schlesinger, Rafferty, Jarrard, and Plumb jointly and severally, for all the relief given him by the jury's verdict, and that the $1,000 note was a primary obligation of the partnership, for which appellee Kennerly was secondarily liable, and that the overdraft was the obligation of the partnership, for which appellee Kennerly was in no way liable.

Judgment was also entered in favor of Fidelity & Deposit Company of Maryland against the University Ice Cream Company and Schlesinger, Rafferty, Jarrard, and Plumb, for the amount of its claim against them. Interest on all recoveries was adjudged to run from the 21st day of February, 1930. Appellants are Schlesinger, Rafferty, Jarrard, and Plumb, and appellees are Ples B. Kennerly and Fidelity & Deposit Company of Maryland.

Appellants' first proposition is that the petition of appellee Ples B. Kennerly does not allege that they were partners. This proposition is overruled. Appellee Kennerly alleged that the defendants were resident citizens, or owned property within the corporate limits of the town of West University Place in Harris county; that they decided to change the status of this municipal corporation so that it could levy a greater tax rate and thereby install certain municipal improvements, which would result in greatly enhancing the value of the property of the defendants within the corporate limits of the town; that to accomplish this purpose it was necessary to have a manufacturing plant established within the corporate limits of the town; for the purpose of organizing and operating the manufacturing plant the several defendants made independent contributions to the joint fund, which was delivered to one D. W. Cooley, who took the fund and bought certain property within the corporate limits of the town, taking the title in his name as trustee; that upon this property was erected the plant of the University Ice Cream Company, in which the necessary machinery was installed, and further, to quote from appellees' summary of the petition:

"It is alleged that prior to November 1, 1926, the town of West University Place in Harris County, Texas, had the legal status of an incorporated town or village which had not accepted the provisions of Title 28 of the Revised Civil Statutes of Texas, 1925; that it contained less than 600 inhabitants; that it had no manufacturing establishment within its corporate limits; and that therefore it could not legally adopt the provisions of Title 28 and become vested thereby with all the rights, powers and immunities conferred by such law.

"Reference to the statute (Articles 961, et seq.) will disclose that this change of status could only have been accomplished by a town of at least 600 inhabitants, or by a town of whatever population containing one or more manufacturing establishments within its corporate limits.

"The town of West University Place having less than 600 inhabitants and no manufacturing establishment, it is alleged that these defendants provided the missing requisite by erecting and operating the ice cream

factory in question within the corporate lim-. its of the town.

"It is alleged that the town thereby,became legally qualified to adopt, and on November 1, 1926, did adopt, the provisions of said Title 28, the Ordinance of adoption and acceptance containing, among others, a finding that the town of West University Place had theretofore been regularly incorporated as a town or village, etc., and further:

" 'And it further appearing affirmatively that there is located within the corporate limits of such corporation a manufacturing establishment, to-wit, an ice cream factory, and that therefore said corporation is entitled to adopt and accept the provisions of Title 28, Revised Civil Statutes of 1925, relating to Cities and Towns. * * * '

"With further reference to the nature of the arrangement and agreement between the alleged partners, the petition asserts that they became co-owners and joint operators of the ice cream factory for the purpose stated above; that no income or profits from its operation were expected or desired; that it was contemplated merely that the establishment be operated, and sold if possible to a purchaser who would keep it in operation; but at all events that it be kept operating; and that it was contemplated by the agreement, in the event any profits were realized from operations or proceeds derived from a sale, the said co-owners and joint adventurers in the project would have the right to share therein on a pro rata basis.

"The allegations are that the factory was so operated from a time shortly prior to November 1, 1926 until January 11, 1928; and that cessation of operations followed shortly after the town attained a population of 600. The alleged operations consisted, chiefly, of the manufacture, storage and sale of ice cream, and the storage and sale of ice.

"The plaintiff alleges that he was employed by the alleged partners as manager of said University Ice Cream Company at a salary of $200.00 per month; that he was engaged in the performance of his duties as such manager pursuant to his contract of employment, keeping the plant and business in operation, from March 11, 1927 to January 11, 1928; that prior to and during the course of such employment the alleged partners were endeavoring to sell him the properties and business; that finally plaintiff entered into negotiations for such purchase but no deal was ever consummated; that on August 27, 1927, plaintiff paid $700.00 to the alleged partners under an agreement in writing that said amount should be returned to him if for any reason the proposed deal was not consummated; that he made additional cash advances totaling $114.- 62 in the course of his operation of the factory and business as manager thereof; and that certain indebtedness, including a $1,000.-

00 note and a small overdraft, was incurred by the alleged partners, operating as University Ice Cream Company, in favor of Marine Bank & Trust Company, which note was endorsed by plaintiff.

"It is further alleged that during July, 1927, at his own cost and expense, plaintiff erected a two story dwelling house on the factory site, with the understanding and agreement that it might be removed by him at the termination of his employment and in the event he did not purchase the properties and business of the Company.

"Plaintiff alleges that by reason of the facts detailed, the legal relation of partnership existed between the named defendants; that they were so engaged in the joint enterprise by and through their agents, D. W. Cooley, H. B. Schlesinger and/or J. H. Rafferty; (these three alleged agents were also defendants and alleged partners, and Schlesinger and Rafferty are plaintiffs in error herein—Cooley died after the suit was filed and before the trial); and that, in each and all of the things done, acts performed, contracts executed and agreements made, by the said Cooley, Schlesinger and/or Rafferty as alleged, the said Cooley, Schlesinger and/or Rafferty were then and there acting for themselves, for each other, and as agents and trustees for the other alleged partners; and that said transactions were within the scope of their general authority as such. Cooley is alleged also to have been President of Marine Bank & Trust Company throughout the course of these events."

Without a further analysis of the petition, or discussion of the allegations as summarized above, we think the petition clearly alleged a partnership between the defendants and a partnership liability.

■ Appellants' main contention is that the evidence was insufficient to raise the issue of partnership against Schlesinger, Rafferty, Jarrard, and Plumb, and the partnership of Jarrard & Plumb. We sustain this contention in so far as it relates to Jarrard and Plumb and the partnership of Jarrard & Plumb. Appellee Kennerly has brought forward in his brief all the testimony relied upon by him to sustain the jury's finding that Jarrard and Plumb were partners in the University Ice Cream Company. This evidence goes no further than to show that they made a contribution of $2,500 to establish the ice cream company, for the purpose of enabling the town of West University Place to change its status as a municipal corporation and increase its tax rate. As a result of the donation made by Jarrard and Plumb, and the contributions made by the other defendants named in the petition, the ice cream company was established, the status of the town was changed, the tax rate was increased, and the contemplated municipal improvements were installed.

But under all the testimony brought forward by appellee Kennerly the donation of Jarrard and Plumb was a gift to those who had the proposition in charge. There is not a syllable of testimony in appellees' brief showing, or tending to show, that Jarrard and Plumb had any interest in the ice cream company or ever claimed any interest therein, or ever exercised or attempted to exercise any control over its management or the disposition of its property. It follows that the judgment against these two defendants personally, and as constituting the partnership of Jarrard & Plumb, must be reversed, and the cause remanded for a new trial.

■ The following is a brief summary of the facts on the issue of partnership as it relates to Schlesinger and Rafferty. Appellant Plumb testified: "Our contribution was made with the understanding that some sort of plant would be built, some sort of an industry established, but we didn't know what it would be. We knew it had to be an operating industry; at least I suppose we knew it had to be operating. * * * As I remember, Mr. Schlesinger and Mr. Rafferty are the gentlemen with whom we had the agreement with reference to making this contribution. * * * It is very hard for me to remember just what that agreement was without having this information before me, and I say we have nothing in writing, but that was the agreement, that if a manufacturing plant could be built up there, the status of the city would be changed whereby a different levy of taxes could be made and with that levy of taxes, a storm sewer system would be possible in that property. There was no agreement with reference to whether or not the industry should be operated, I am sure of that. It may be possible I testified in my deposition that there was an agreement, you can look at the deposition and see. I presume that it is true that at the time my depositions were taken, I was asked, 'At the time that contribution of twenty-five hundred dollars was made by you and Mr. Jarrard, was it contemplated that this ice cream plant be erected on the property and operated as a going industry?' And I presume that I answered, 'It has been so long it is hard for me to answer those questions, but we anticipated that they were going to put an industry there of some kind, and it was to be sold so that somebody would operate an industry.' You have the deposition there before you and I presume that is correct although I don't remember what I told you at that time, that has been so long ago. * * * At the time Mr. Jarrard and I made that agreement with Mr. Schlesinger and Rafferty to make that contribution there were other parties who were to make contributions also."

W. S. Graves testified that he represented a certain manufacturing company in installing the machinery in the plant; that he dealt with Schlesinger and Cooley in the matter and "after I had showed the plant to Mr. Schlesinger, he remarked that he thought, 'we will do well here,' and that Cooley said he was 'simply trustee for the others.'" Appellee Kennerly testified as follows as to a conversation between him, Rafferty, and Cooley when they were driving out to the ice cream company for the purpose of inspecting it: "On the way out there they had told me that Mr. Cooley was trustee. I was on the front seat with Mr. Rafferty, and in the general conversation I said, 'who owns the ice cream factory?' and he said, 'A bunch of us fellows,' he said, 'Denton (Cooley) and Schlesinger and me and a bunch of others.' * * * They tried to boost it up, Mr. Rafferty told me what a wonderful proposition it was, also Mr. Cooley in the meantime asked Mr. Rafferty, 'Jack, have you got the keys?' and he said, 'No, I haven't got them, Schlesinger has them.' * * * They wanted me to buy the place and I told them I wouldn't consider buying it at all. * * * Both of them insisted on my buying it, assuring me that I would make some money, and I told them, 'No,' it was absolutely too far from taw. * * * Going on back to town, they asked me, 'What do you think of it? Don't you think it would be a good thing to buy?' and I told them no, I did not. They said, 'We have got to have that plant run.' Mr. Rafferty did most of the talking, I was on the front seat with him and he said, 'We have to run it. What salary would you run it on?' I said I was making two hundred dollars a month at that time, and I would be willing to operate that plant for two hundred dollars a month. They discussed that and said it did not seem unreasonable."

Ples Kennerly's testimony concerning a subsequent conversation between himself, Rafferty, Schlesinger, and Cooley on March 11, 1927, when the four of them had lunch together at the Auditorium Hotel in Houston, is as follows: "The question came up as to just what we wanted to do. I told them I would give them my advice, what I thought. * * * and finally Mr. Schlesinger suggested we call it the University Ice Cream Company and they decided to do that, and they asked me if I was interested in buying the place, and I told them 'No,' and they told me to go ahead and run it, and Mr. Rafferty reminded me of the conversation on the ride out there and he asked me if I thought two hundred dollars a month would be all right, and I told him 'Yes,' and they said 'All right,' and they said that any time in the future I would have an opportunity to buy the plant. The said that my duties would be to go out there and run it as manager on a salary of two hundred dollars a month. That was O. K.'d by Rafferty, Cooley and Schlesinger, they discussed it and said that was all right. I asked them when they wanted me to go to work, and they

said, 'You are hired right now,' and I said, 'All right.' I told them that we were going to have to have some stuff, some things that were needed, and Mr. Cooley said, 'All right, you go ahead, and whatever you want to buy, have them phone me, and I will O. K. the order.' * * * Mr. Cooley remarked during the conversation more than once 'Of course I have an interest in it, I am trustee for the boys and I have an interest in it myself.' * * * They wanted to interest me, and keep me interested in running the place, and eventually sell it to me, and Mr. Schlesinger said, 'I tell you we have a wonderful proposition out there and we are going to make some money out of the ice cream proposition. You stay with us and you will get along all right and do well,' or something like that, I don't remember exactly."

Mr. Kennerly testified further that he worked at the ice cream company as manager from the 11th day of March, 1927, to the 11th day of January, 1928, and, further, as follows:

"In the operation of the plant, I would have to buy little equipment that we needed, and I did not feel like buying that without consulting them, and I would always advise Mr. Cooley in advance that I was coming down to see him at the bank, because I could not always catch him, and when I would get there to transact those matters with him I would find Mr. Rafferty and Mr. Schlesinger present. If they were not there when I got there, they would come in shortly afterwards I arrived. * * * Cooley and Schlesinger and Rafferty gave me authority to buy stuff when I first went there. * * * Aside from Denton Cooley I had dealings with Mr. Schlesinger and Mr. Rafferty with reference to the actual running of that plant. * * * After I got out there and was running the plant, everytime I would go to Denton Cooley's office Mr. Rafferty was there and I would discuss things with him. I discussed the operation of the plant with Rafferty almost as much as I did with Cooley because he was always present when I discussed the running of it. * * * I went to see Mr. Cooley as Rafferty's trustee, I understood he was manager for them, and nearly every time I would go to see Cooley they were there. I have told about the instructions I got from Rafferty in a way, but there are a lot of instructions if I could remember all of them. * * * With reference to my going to Schlesinger for instructions with reference to the operation of that plant, sometimes I would go to the bank find the three of them there and we would discuss the proposition and Mr. Schlesinger was out at the plant off and on all the time. He came out there to the plant lots of times."

"I would allow a man who was an owner to come in and check my books. I considered Mr. Schlesinger as an owner, he told me he was part owner of the business, and I considered him as an owner since I made the deal with him. * * * There were other times when I saw Schlesinger, he came out to the place in the latter part of May and he wanted me to agree to buy the place and he told me it was a wonderful thing, and he said that if he had the money he would buy it from the rest of the boys. * * * It is true that I stated on direct examination that Mr. Schlesinger told me that if he had the money he would buy the interest of the other boys. * * * I undoubtedly did think that Schlesinger had that ice cream factory, because he was trying to sell it to me. I dealt with Schlesinger on the basis of him being an owner, and they were trying to sell it to me. * * * I don't suppose you would have a bank account and write checks on it and not know whether or not somebody else was checking on it, but I didn't know what Cooley, Schlesinger or Rafferty did because I was running that business for them and they told me I could write checks and I didn't make any inquiry about it. On none of these occasions that I was required to make loans to the company, to help out this company by doing a good deed, did I make a request on Schlesinger or Rafferty or the Pemberton Company or any of these numerous people to come down and make a deposit in the bank. I knew at that time, from what they had told me, that these other people were interested in that company, but I did not make any demand on any of them. * * * I do figure that from my individual dealings with all of these various defendants that I have a claim against them, I knew that they owed me the money. * * * It did not seem unusual to me when Mr. Rafferty made the statement that Denton Cooley was the trustee for the whole bunch of the boys."

He testified that it was along about the latter part of May, 1927, that he began to discuss the details of his proposed purchase of University Ice Cream Company and in that connection had the following conversation with Cooley: " * * * When I went in to see Mr. Cooley on some other matter he approached me on the same subject, and said something about what Schlesinger had told him. I said, 'Well, I wouldn't mind considering buying it if you will do like you say, if you will finance me.' I also suggested to him, 'Go ahead and have them write up a contract, just what kind of proposition you can offer me, and we may be able to talk trade.' He said, "All right, I will get Schlesinger to write up that contract.' That was the latter part of May, and every time I would see Mr. Cooley, when the question would come up thereafter, he would say, "All right, Schlesinger is going to make that up right away.'"

His testimony concerning the conference at

the bank on August 27, 1927, participated in by himself, Rafferty, Schlesinger, and Cooley, during which he paid $700 to "D. W. Cooley, Trustee," upon being urged that "the boys" were going to "need a little money," was as follows: "In regard to the circumstances which led up to the giving of this seven hundred dollar check on August 27, 1927, were these: Mr. Schlesinger called for me, and I got in touch with him at the bank and he asked me to come down and I went down to the bank. That was on a Saturday evening along in the latter part of August, it must have been August 27, you will find that to be on Saturday evening. I went down to the Marine Bank & Trust Company Building, and Mr. Rafferty, Mr. Schlesinger and Mr. Cooley were there in Mr. Cooley's office, and they asked me if I didn't want to make a seven hundred dollar payment on the ice cream factory, and I told them I couldn't do a thing like that, and they said, 'You are going to buy it aren't you?' and I said 'Well, that depends, I am thinking about it but I haven't any contract yet.' Then they said, 'You want the place, don't you?' and I said, 'That all depends. I can't afford to pay you seven hundred dollars and after I pay that you may raise the price on me, you may do lots of things. You might decide you didn't want to sell it, and then I've got my seven hundred dollars in it.' Mr. Cooley said, 'I will give you a receipt for it,' and I told him that the receipt would not do any good, and he told me he was going to New York,—first before I did that, he said, 'The boys are going to need a little money before Jack and I get back, we are going to New York, and the boys are going to need a little money, and we would like mighty well for you to pay that seven hundred dollars now.' I said, 'I couldn't do that now, Mr. Cooley, you may go to New York and get killed.' Mr. Rafferty assured me, 'Well, Ples old boy, you can figure you are dealing with friends when you are dealing with us.' I don't remember whether Mr. Schlesinger was sitting down or not, but Cooley and Rafferty and I were sitting down. Mr. Cooley said, 'You would not mistrust me, would you?' and I said, 'No, I have all the confidence in the world in you, but this is just to protect me. You might get out of it,' and he said, 'Well if I put on there that if for any reason the deal is not consummated the seven hundred dollars will be returned to you, that will satisfy you.' Well I saw no reason why I should not and he wrote out this receipt just like it is and then he said, 'Now don't that look all right, don't that look like I am sincere with you?' and I said, 'Well, Mr. Cooley, that is all right, you are going to finance the proposition, I guess that is all right,' and I wrote out the check. The deal was to be finally consummated by a written contract."

The receipt itself provided as follows:

"Aug. 27, 1927

"Received of P. B. Kennerly $700 cash consideration in sale of West University Ice Cream Co. to P. B. Kennerly, this amount to be returned to said Kennerly if for any reason deal is not consummated.
"O. K.     D. W. Cooley     D. W. Cooley,
                                        "Trustee."

Appellee has made the following summary of the testimony of Mrs. Kennerly:

"Mrs. Ples Kennerly's testimony was that Schlesinger referred to the plant as 'our ice cream factory' more than one time in the different conversations she had with him when he came to the plant, and that on one occasion Schlesinger remarked that he did not want to sell his part of the factory, that business was good, and he felt like 'the boys' were making a mistake in wanting to sell; her testimony that an accounting of the operation of the plant was made to Schlesinger and that he came out from time to time to see about it and check up on sales, that he was there every week or two looking at the cash book and checking up, and that Cooley and Schlesinger were the two men that came out to the plant and gave instructions about running it, coming out there 'quite often'; her testimony that Schlesinger came by and asked about the operation of the business because he was interested in it, and 'I say he was interested in it because he said he was an owner'; her testimony about Schlesinger's concern over a wreck in which the University Ice Cream Company's delivery truck was involved in June, 1927, and that 'he came out to see about it,' 'was interested in it,' and 'took charge of it'; her testimony concerning Schlesinger's request in June, 1927, that a financial statement of University Ice Cream Company be made up, and Schlesinger's explanation at the time, 'The boys are going to have a meeting the first part of next week and I must have a financial statement to give them'; her testimony as follows:

"'I don't remember whether or not Mr. Rafferty, or Mr. Schlesinger or Mr. Cooley at any time after June had possession of the books and records of the business. It is true that during all of that time we were working for them as their employees; they were our employers and had the right to the possession of those books and records.' Her further testimony:

"'It is a fact that during the months of August, September, October and November (1927) Mr. Schlesinger continued to come by weekly and look over our books, because he was still trying to get us to buy the property.'"

This testimony raises the issue that the citizens of the town of West University Place were making contributions for civic improvements; that the contributions were made and appropriated by Cooley, Schlesinger, and Raf-

ferty; that with these contributions they organized the University Ice Cream Company and purchased for that purpose the real estate described in the petition and built and equipped the plant; that, after the business was organized, and the property bought and the plant built and equipped, these defendants claimed to own a joint interest therein and controlled and operated it joint ly and were jointly liable for its debts and jointly entitled to its profits. As we understand this testimony, it was sufficient to raise, as issues of fact for the jury, every essential element of partnership.

Appellants have attacked all the findings of the jury as being without support. We think the evidence quoted sustains the verdict of the jury on all issues submitted to them, and without further discussion of these particular assginments they are overruled.

The court did not commit reversible error in refusing to strike Exhibit A from appellees' petition. Whatever construction should be given rule 19 for the district and county courts of Harris county, regulating the striking of exhibits intended to be used only as evidence, we think Exhibit A was pleaded by appellee as an essential part of his petition and not as mere evidence.

 Appellee Kennerly offered in evidence a carbon copy of the letter written to Mr. Cooley by Mr. Kennerly's attorneys, suggesting certain terms and conditions upon which Mr. Kennerly would be willing to buy the ice cream plant. This letter was objected to upon the ground that it was a carbon copy, immaterial, irrelevant, and so forth. The following statement made by appellees in their brief relieved this letter of all objections urged against it:

"The letter indicates that a carbon copy thereof was addressed to 'Mr. H. B. Schlesinger, Keystone Building, Houston, Texas.' Ples Kennerly testified positively that the carbon copy of said letter which was introduced in evidence was brought to him by Schlesinger; that the marginal notations made with pencil on said carbon copy were on there at the time Schlesinger delivered such carbon copy to him; that Schlesinger said to Ples Kennerly at that time, 'Mr. Cooley and I have discussed this thing and we have marked on the margin as to our approval and disapproval of the letter'; that thereupon Schlesinger requested that Ples take the copy back to the attorney who wrote the letter; and Ples testified, 'Mr. Schlesinger did make reference to these marginal notes, he said they had indicated their approval or disapproval by these marks.'

"The marginal notations referred to, which were on the carbon copy of the letter introduced in evidence, are in some instances 'O. K.' and in some instances 'No.' "

The court did not err in receiving in evidence the orders of the town of West University Place dated the 1st day of November, 1926, adopting the provisions of title 28, R. S. (article 961 et seq.). These orders were admissible as explaining the purpose of the establishment of the ice cream company and that those who made pure donations had received all they contracted for in making the donations.

The court permitted Mrs. Kennerly to testify as to a conversation between her and Jarrard. The testimony was objected to upon the ground that it was irrelevant and immaterial. Of course, it was admissible as against Jarrard, and there was no request that it be limited in its effect to the issue between Kennerly and Jarrard. Without such a request its admission did not constitute reversible error as against the other defendants.

The trial court erred in allowing interest on the $700 item only from the 21st day of February, 1930. This item was established by the receipt above copied, dated the 27th day of August, 1927. After negotiations for the sale of the property to Kennerly were broken off, he demanded the repayment of this money on the 20th day of December, 1927, and was therefore entitled to interest from that date.

From what has been said it follows that the judgment of the lower court should be reversed and remanded as to Jarrard and Plumb; that it should be reformed in favor of appellee Kennerly against appellants Schlesinger and Rafferty, by allowing him interest on the $700 from the 20th day of December, 1927, and, as so reformed, affirmed.